**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| | ) |
| COLLEEN MILES, | ) |
| 7302 Keysville Road | ) |
| Keymar, MD  21757 | ) |
| | ) |
| Plaintiff | ) |
| | ) **CIVIL CASE** |
| | ) **NO. _____** |
| | ) |
| v. | ) |
| | ) |
| | ) |
| COMMUNITY CARE BEHAVIORAL | ) |
| HEALTH ORGANIZATION | ) |
| 1200 Camp Hill Bypass | ) |
| Suite 100 | ) |
| Camp Hill, PA  17011 | ) |
| | ) |
| SERVE: | ) |
| Edward E. McGinley, Jr., Esq. | ) |
| VP and Associate Counsel | ) |
| Corporate Employee Relations | ) |
| University of Pittsburgh Medical Center | ) |
| 28th Floor, U.S. Steel Tower | ) |
| 600 Grant Street | ) |
| Pittsburgh, PA  15219 | ) |

1

)
AND                                                          )
                                                             )
UNIVERSITY OF PITTSBURGH                                     )
MEDICAL CENTER                                               )
200 Lothrop Street                                           )
Pittsburgh, PA  15213                                        )
                                                             )
       SERVE:             )
       Edward E. McGinley, Jr., Esq.   )
       Vice President and Associate Counsel   )
       Corporate Employee Relations   )
       University of Pittsburgh Medical Center   )
       28th Floor, U.S. Steel Tower   )
       600 Grant Street   )
       Pittsburgh, PA  15219   )
                                                             )
AND                                                          )
                                                             )
TAMMY POOLER, INDIVIDUALLY                                   )
1200 Camp Hill Bypass                                        )
Suite 100                                                    )
Camp Hill, PA  17011                                         )
                                                             )
       SERVE:             )
       Edward E. McGinley, Jr., Esq.   )
       Vice President and Associate Counsel   )
       Corporate Employee Relations   )
       University of Pittsburgh Medical Center   )
       28th Floor, U.S. Steel Tower   )
       600 Grant Street   )
       Pittsburgh, PA  15219   )
                                                             )
       **DEFENDANTS.**    )
                                                             )

## COMPLAINT

## Jury Trial Demanded

Plaintiff, Colleen Miles, claims damages upon a cause of action against Community Care Behavioral Health, University of Pittsburgh Medical Center, and Tammy Pooler, collectively and individually, whereof the following is a statement:

## Preliminary Statement

Plaintiff Colleen Miles (hereinafter "Colleen") is a 40-year-old woman who had been a loyal CCBH/UPMC employee for nine years. She had received above-average performance evaluations, raises, and was well-liked and highly respected by her UPMC colleagues and consumers.  However, soon after Defendant Tammy Pooler became Colleen's supervisor in the Spring of 2005 and Colleen requested and took FMLA leave in the Summer of 2005, Colleen's working conditions changed suddenly and drastically.

On or about August 2005, Defendant Pooler was angered and annoyed that Colleen took FMLA leave to care for her own serious medical condition.  While Colleen was out on FMLA leave during the Summer of 2005 to have and recover from major surgery, Defendant Pooler contacted Colleen several times a week.  Due to this interference, Colleen cut short her FMLA leave, even though she had

an open wound, which required doctor visits two to three times a week for wound care.

Upon returning to work in September 2005, Colleen had to use paid time off time to cover her doctor visits, even though she was a salaried employee and even though she had the right to use intermittent FMLA leave.

Defendant Pooler held, and continued to hold, Colleen's use of FMLA leave against her.  Just recently in Colleen's November 2006 performance evaluation, Defendant Pooler cautioned Colleen that she needed to accrue two days of PTO time before she could use any PTO time at all.

In reality, had Defendants UPMC, CCBH, and Pooler not been illegally docking Colleen's pay for over two years, Colleen would have had plenty of PTO time banked when she took an unpaid sick day in the Fall of 2006.

Defendants have retaliated against Colleen for refusing to disclose confidential patient medical information in violation of HIPAA. Additionally, Defendant Pooler had also treated and perceives Colleen as if she is mentally ill, which is particularly troublesome given the work and mission of CCBH.  Statements such as, "you

4

need to avoid an emotional and reactionary response" in an employee's evaluation, are evidence of such perception.

The situation had grown intolerable, physically and emotionally, for Colleen. The Defendants' response was inadequate and unreasonably delayed. Since complaining of discrimination, retaliation, and harassment, Colleen had been ostracized by CCBH management. Colleen's co-workers at CCBH were been told not to get involved in HR's investigation and have been told they will suffer retribution and retaliation from their supervisors if they do. In January 2006, another of Colleen's co-workers was suspended, and later fired, just hours after making a discrimination and retaliation complaint against her supervisor.

Given this, Colleen had justifiable concerns that her discrimination complaint was not being taken seriously and that it is, and will, not be treated fairly. Among other statements during this conversation, the Vice-President of Human Resources told Colleen that her complaint was "making a mountain out of a mole hill." The HR Vice President also forbade Colleen from communicating via email with Defendant Pooler at all and anyone else, including HR, regarding her discrimination and retaliation complaint.

Based on the illegal discrimination, retaliation, and harassment, Colleen has had to seek medical care at the emergency room and with her physician as the work situation was completely unbearable and intolerable. As a result, on January 16, 2007, Colleen was forced to resign from her nine-year employment with Defendants. She has filed for, but has not yet received, unemployment compensation benefits and has been without crucial income to support herself. She has also filed an age and disability discrimination complaint with the Pennsylvania Human Relations Commission

## **JURISDICTION**

1. Jurisdiction is invoked pursuant to the Family and Medical Leave Act (hereinafter "FMLA"), the Fair Labor Standards Act (hereinafter "FLSA"), and the Health Insurance Portability and Accountability Act (hereinafter "HIPAA"), which provide for original jurisdiction of Plaintiff's claims arising under the laws the United States and over actions to recover damages and to secure equitable and other relief under the appropriate governing statutes.

2. This Court has jurisdiction over Plaintiff's state claims pursuant to its supplemental jurisdiction as codified at 28 U.S.C. § 1367.

3.     Plaintiff has exhausted all administrative remedies and has
       taken all other steps necessary to bring this action before this
       Court.

## **VENUE**

4.     The actions complained of herein occurred within the
       jurisdiction of this Court and involve a Defendant who resides
       within its jurisdictional limits.

5.     Venue is accordingly invoked pursuant to the dictates of 28
       U.S.C. § 1391(b) and 1391(c).

## **PARTIES**

## **PARTIES**

6.     The Plaintiff, Colleen Miles, is a citizen of the County of Carroll,
       State of Maryland residing at 7302 Keysville Road, Keymar,
       Maryland 21757.  Until January 16, 2007—the day Plaintiff was
       forced to resign from her near nine years of employment—
       Colleen was a salaried employee of the Defendant CCBH.
       Plaintiff wishes to file a complaint under the Family and Medical
       Leave Act, 29 U.S.C. § 6401 *et seq.,* the Fair Labor Standards
       Act, 29 U.S.C §201 *et seq.*, and the Health Insurance Portability
       and Protection Act, 42 U.S.C. § 1320 *et seq.*

7.     Defendant Community Care Behavioral Health Organization

       (hereinafter "CCBH") is a Pennsylvania not-for-profit

       corporation with its principal place of business and

       headquarters in Pittsburgh, Pennsylvania.  CCBH is a

       subsidiary of Defendant UPMC.  CCBH has offices throughout

       Pennsylvania, including Camp Hill, Exton, Moosic, and Berks

       County and employs in excess of 300 employees.  At all times

       relevant hereto, CCBH is engaged in commerce or in any

       industry or activity affecting commerce and employs 50 or more

       employees for each working day during each of 20 or more

       calendar workweeks in the current or preceding calendar year.

       CCBH is thus an Employer as defined by 29 U.S.C. § 2601 *et*

       *seq.*, is liable for Plaintiff's damages, and is responsible for the

       acts of its supervisory employees and its board members.

       CCBH is thus an Employer, is liable for Plaintiff's damages, and

       is responsible for the acts of its supervisory employees.

8.     Defendant University of Pittsburgh Medical Center (hereinafter

       UPMC) is a Pennsylvania corporation with its principal place of

       business and headquarters in Pittsburgh, Pennsylvania.

       CCBH is a subsidiary of UPMC.  UPMC employs 40,000 people

at 19 hospitals and a network of other care sites across a 29-county service area; it also operates international health care centers in Italy and Ireland.  UPMC is engaged in commerce or in any industry or activity affecting commerce and employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year.   UPMC is thus an Employer as defined by 29 U.S.C. § 2601 *et seq.*, is liable for Plaintiff's damages, and is responsible for the acts of its supervisory employees and its board members.

9.   CCBH is thus an Employer, is liable for Plaintiff's damages, and is responsible for the acts of its supervisory employees, including Defendant Tammy Pooler.

10.   Defendant Tammy Pooler is currently employed with the Defendant CCBH as a Quality Manager.  Defendant Pooler was Colleen's direct supervisor from April 2005 until Colleen's forced resignation on January 16, 2007. An "employer" for purposes of the FMLA includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer."  29 U.S.C. § 2611(4)(a)(ii)(1).

For purposes of the FMLA, a "person" "means an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons." 29 U.S.C. § 203(a).  According to the FMLA's regulations, "[a]n 'employer' includes any person who acts directly or indirectly in the interest of an employer to any of the employer's employees . . . Individuals such as corporate officers 'acting in the interest of an employer' are individually liable for any violations of the requirements of FMLA".  29 C.F.R. 825.104(d).  Because Defendant Pooler acts and acted, directly or indirectly, on behalf of CCBH to its employees, she is an employer for purposes of the FMLA and is individually liable for Plaintiff's damages.  Additionally, Defendants CCBH and UPMC are responsible for the acts of its supervisory employees, including Defendant Pooler.

## FACTUAL ALLEGATIONS

11.   Plaintiff, Colleen Miles (hereinafter "Colleen"), is a 40 year old woman, date of birth August 14, 1966.

12.   Colleen had worked for Defendant CCBH, a division of the
      Defendant UPMC for nearly nine years and was one of the
      original employees hired by the company.

13.   Among Defendant CCBH's values are:  "To appreciate the
      diversity of our members, families, communities, providers and
      staff; "To be accountable to the citizens of our region in all of
      our work," and "To provide a culturally competent workplace
      that encourages employee growth and promotes employee
      satisfaction."

14.   Colleen transferred to CCBH in Camp Hill, Pennsylvania in
      November of 2002 from Pittsburgh to assume a position as
      Complaint and Grievance Coordinator.

15.   During her tenure at CCBH, Colleen had enjoyed above
      average success.  She was promoted three times and had
      enjoyed primarily solid performance reviews.

16.   She had always have received much praise for a job well done,
      both from senior management and from consumers, for
      outstanding performance and customer service.

17.    Colleen he has had good feedback on her work performance
       and has established solid relationships with State, County and
       Consumer representatives.

18.    Many times, Colleen received positive feedback from many of
       her peers at Community Care relative to her work with
       complaints and grievances.

19.    Colleen has enjoyed being a Complaint and Grievance
       Coordinator for the past five years.

20.    This changed soon after Defendant Pooler began her position
       with CCBH as Quality Manager in the Camp Hill office in April
       2005.

21.    During that time, Colleen had endured extreme levels of stress
       due to Defendant Tammy Pooler's continued harassment,
       discrimination, intimidation and retaliation.

22.    Colleen had sought to resolve this situation repeatedly over the
       past year, but to no avail.

23.    When Defendant Pooler was hired in April of 2005, Colleen told
       her that she had been experiencing severe health conditions
       and that she would soon be having an operation to relieve
       many of the occurrences of illness.

24.   In July 2005, Colleen underwent a gastric bypass surgery and
      was scheduled to be on FMLA leave for three weeks.

25.   After her surgery, she experienced complications and her
      FMLA leave was extended until the day after Labor Day 2005.

26.   While Colleen was on FMLA leave, Defendant Pooler either
      called her home or had a secretary call her home,
      approximately two to three times per week to ask Colleen work
      related questions.

27.   Many of the times Defendant called Colleen, she expressed
      frustration with how busy she was and asked Colleen to return
      to work.

28.   Because of Tammy's repeated pressure to return to work,
      Colleen asked her surgeon if it would be feasible to return to
      work before her wound infection had healed entirely.

29.   Colleen was, at this point, having a visiting nurse who would not
      be able to continue to come to her home once she returned to
      work.

30.   Colleen's doctor stated that he would release her to work if she
      were to attend a wound care center in the area a few times per

week to have her wound cleaned and dressed and observed by a physician.

31. Colleen agreed to do this and her physician released her back to work on the following Monday, which was Labor Day, a scheduled vacation day at CCBH.

32. After Colleen's return to work on Tuesday, Defendant Pooler advised Colleen that she would have to have a new release to work because it was dated for a holiday and that she could not get paid for the holiday because she had been utilizing FMLA leave and would be returning from FMLA leave.

33. Colleen telephoned the physician's office to obtain a new release; however, she did not get paid for the holiday from her short term disability plan either because the original return to work note indicated that she could go to work that Monday.

34. Recently in December 2006, Defendants' payroll department completed a spreadsheet in which they indicated that Colleen was docked pay for that holiday because she was late in completion of her FMLA paperwork.

35. In fact, this is not true.  Colleen had her paperwork submitted prior to her operation.  Colleen gave Defendant Pooler all

updated information as necessary. She provided a return to work note several days in advance of the holiday and was told that she could not be paid for the holiday due to her use of FMLA leave.

36. Because Colleen had many episodes of illness prior to her operation and immediately following her operation and because Colleen had not accrued any paid time off during her FMLA leave, she did not have ample paid time off (hereinafter "PTO") to cover the times she had to go to the wound care center.

37. As a result, Defendants docked Colleen's pay for partial days missed due to getting medical treatment.

38. At times, she was illegally docked pay for middle of the day appointments.

39. For example:  Colleen reported to work at 8:30am.  She worked until 1:00 pm, at which time she left to go to the wound care center and returned to work at 3:00 pm.  She gets one hour for lunch but was gone for two hours.  She would be docked one hour at either the beginning or end of the day.

40. At no time did Defendants ever inform Colleen that she did not have to use PTO time to go to doctor appointments (because

she was a salaried employee) or that she could take
intermittent FMLA leave, which was her right under both the
FLSA and the FMLA.

41.   Furthermore, after Colleen took FMLA leave to care for her
serious health condition, Colleen began to notice differences in
the way she was treated by staff and management.

42.   Colleen was no longer invited to meetings regarding the
complaint and grievance process.

43.   Where before her opinions were well regarded and valued, she
was now ousted and dismissed.

44.   When she pointed out process deficiencies and asked for
resolution, she was treated as if she were being bothersome.

45.   Once, Colleen went to lunch with a clinical manager and told
her that she was experiencing this sense of change.  She
advised Colleen that she would be well served to be cautious of
how she was portrayed to Senior Management.

46.   She told Colleen that there were remarks made such as she
tended to "split". This is a mental health term and is used in
relation to very negative personality disorders.

47.   Colleen took heed of her advice and began to pay attention to the language that was used in conversations with Defendant Pooler and the tactics she used to address her (Colleen's) alleged "behaviors".

48.   Colleen was forced to endure being treated differently, in a demeaning way for many months.

49.   During closed door supervision meetings, Defendant Pooler told Colleen that she had to acknowledge her own behaviors in order to begin to make positive changes in her personality.

50.   Colleen repeatedly asked that she not be subjected to closed door meetings with Defendant Pooler as this was when she took opportunity to really say demeaning and intimidating things to Colleen.

51.   Defendant Pooler rarely did this in front of witnesses.

52.   Colleen first asked Beth Pickering in her letter to have Senior Management present during these meetings.  Ms. Pickering refused.

53.   Later in December 2006, when Colleen spoke to Sharon, the Vice President of Human Resources at UPMC, she asked for the same remedies, and she declined.

54.   Both Sharon and Beth stated that they were not willing to disempower a manager.  The both used the same words, as if they had discussed this.

55.   Defendant Pooler told Colleen that she could not send email to Senior Management or talk to other managers because she was setting boundaries for Colleen with the support of Senior Management and that she would determine if any concerns that she, Colleen, had were to be elevated to Senior Management.

56.   Colleen reported to Defendant Pooler regarding a serious work issue with her only department co-worker, Susan Ittleson.

57.   Colleen expected Defendant Pooler to take corrective action with Ittleson similar to the actions she had taken with Colleen when addressing any work related issues.

58.   Instead Defendant Pooler confronted Colleen in front of Ittleson and berated her.  She stated that she believed Ittleson reacted to her wearing her behaviors wearing her (Ittleson's) "therapist" hat and this is how Colleen should interpret her behavior.

59.   Evidence of harassment and discrimination as well as intentional retaliation became apparent when Defendant Pooler

presented Colleen with her performance evaluation the last week of November 2006.

60. In the goals section on the last page of the evaluation, Defendant Pooler made a goal for Colleen to process problems with herself or our Associate Regional Director "to avoid any emotional or reactionary responses."

61. This statement was very demeaning, offensive, hurtful, and discriminatory.

62. Working with Behavioral Health professionals, both Defendant Pooler and Colleen knew that these are also words used in association with negative personality disorders.

63. Eventually, after several complaints, Defendant Pooler did comply with Colleen's request and finally removed the sentence from her evaluation.

64. However, the negative impact those words had, especially written in Colleen's employee evaluation, was not minimized by merely erasing them from the document itself.

65. Shortly after Defendant Pooler began as the Quality Manager, she began to question process that had been in place for some time relative to complaint resolution.

66.   Defendant Pooler believed that we were not doing enough of an investigation of complaints and expressed a desire for Colleen to begin to request more in depth documentation for review.

67.   Colleen did comply with Defendant Pooler's requests; however, there were documents requested that were beyond Colleen's qualifications to review, such as medical records and treatment notes.

68.   Colleen asked Defendant Pooler who would review this type of documentation when requested and did not receive an answer.

69.   On or about December 2005, after Defendant Pooler informed Colleen that she, Jim Myers and Nancy Laudermilich had formed a First Level Complaint Review Committee and that they had reviewed the requested documentation.

70.   Colleen had not been informed of the intention to form this Committee or was not invited to participate with the Committee as it was her primary job function to be the First Level Complaint Review Committee.

71.   To the best of Colleen's knowledge this committee only met that one time.

72.   Therefore, there was still no process to review documentation when it arrived.

73.   Colleen became very concerned about the fact that we were requesting documentation with no clear path of what to do with it upon arrival.

74.   Colleen was also concerned about CCBH's policy on storing these sensitive records.  She expressed these concerns in many emails and face to face meetings with Defendant Pooler.

75.   It wasn't until May 2006 that Colleen finally was given the answers to her questions.  She felt that by excluding her from the "committee" and by not addressing my concerns for protecting this sensitive material that Defendant Pooler was creating barriers to Colleen being able to do her job well.

76.   This was done deliberately by Defendant Pooler to discredit Colleen and to foster perception of her inability to perform well, based on Defendant Pooler's perception that Colleen suffered from a mental illness and due to her age 40 years old.

77.   In addition, by not taking steps to resolve these process-oriented questions, Defendant Pooler encouraged a hostile work environment as the failure to be able to follow through with

reviews eventually caused conflict between Colleen and the other Quality employee, Susan Ittleson, who was much younger than Colleen.

78.   Colleen continued to seek resolution to her concerns and Defendant Pooler's discriminatory treatment of continued to grow and become more overt.

79.   Other managers were also treating Colleen as if she were inconsequential.

80.   It was also around this time (December 2005 and January 2006) that Colleen had lunch with the clinical manager and she was advised of the comment Defendant Pooler had made about Colleen's "splitting" behavior.

81.   On February 14, 2006 this situation became escalated.

82.   Colleen had facilitated a Second Level Complaint meeting on February 7, 2006.

83.   At a Second Level Complaint there is a 3 party panel that renders a decision or recommendations regarding the complaint.

84.   This particular complaint included Kendra Kakos from York
County, Brent Maguire, a Community Care Peer Advisor and a
consumer representative from York County.

85.   The panel has sole decision making authority and Colleen
cannot offer any decisions or recommendations to the panel.

86.   During the course of the panel discussion, a recommendation
was made for Community Care to request that the provider
named in the complaint reimburse Community Care for money
which was paid for an evaluation.

87.   As this was something that was not a standard panel
recommendation, Colleen advised the Committee that she
would check with Community Care management to see if this
recommendation could be included in the Complaint Outcome
Letter.

88.   Colleen telephoned Defendant Pooler as she was leaving the
meeting and asked her to review this request with Beth
Pickering, Regional Director.

89.   Defendant Pooler's feedback to Colleen the same day was that
Ms. Pickering agreed to permit the recommendation but

expressed that Community Care would not encourage this as standard practice because the fees are not performance based.

90. Defendant Pooler suggested that Colleen allow Ms. Pickering to review the letter prior to mailing.

91. On February 13, 2006, Colleen sent the letter to Ms. Pickering for review per Defendant Pooler's instruction.

92. This was not a common practice as Colleen's letters generally were not reviewed prior to mailing unless there is some pending or potential legal action that would require review by UPMC attorney Sheryl Kashuba.

93. After review of Colleen's letter Ms. Pickering indicated via email that she did not want to have the recommendation to take the money back included in the letter.

94. Colleen approached Ms. Pickering and advised her that she had already communicated to the panel that the recommendation could stand.

95. She (Ms. Pickering) became agitated and said that she did not want this to be included in the letter. Colleen was confused, as she knew she had received instruction from Defendant Pooler to have the recommendation in the letter.

96.   Colleen went to Defendant Pooler on February 14, 2006 and expressed concern relative to Ms. Pickering's response.

97.   Defendant Pooler told Colleen that Ms. Pickering was irritated that she would make that recommendation a part of the letter.

98.   Colleen reminded Defendant Pooler that she had given Colleen the instruction, per Ms. Pickering, to include the recommendation and she denied doing so.

99.   Colleen reminded her that she had called Defendant Pooler as Colleen was leaving from the meeting and asked her to check with Ms. Pickering.

100.   At this time Defendant Pooler recanted that she did not discuss with Ms. Pickering, but then stated that Ms. Pickering thought Colleen should have known better based upon a prior case in which the county wanted Community Care to request that a facility refund money to CYS that they paid for clothing and essentials for another consumer as part of a complaint resolution.

101.   Colleen advised Defendant Pooler that Colleen saw no correlation between the two situations.  The current situation was Community Care requesting money paid for a service that

was not well done according to the panel.  The other was to request money that CYS paid to a provider for goods.

102. Defendant Pooler became insistent that they were the exact same thing, raised her voice, and ordered Colleen to STOP disagreeing with her.  She concluded the meeting at this point.

103. Later, during Colleen's recent employee performance review in November 2006, Defendant Pooler recollected this incident and pointed it out to Colleen as a time when she thought Colleen was being emotional and reactionary.

104. This same day, immediately following the incident, on February 14, 2006, Colleen called the Director of Quality Management, Stephanie Fudurich.

105. Colleen reported issues with Defendant Pooler involving harassment, discrimination, and intimidation.

106. Ms. Fudurich agreed to talk with Tammy and Colleen agreed to try to work through this situation and move forward.

107. After this meeting with Ms. Fudurich, Colleen made efforts to improve the relationship with Defendant Pooler; however, after Colleen's conversation with Ms. Fudurich, Defendant Pooler's treatment of Colleen worsened and became more hostile.

108. In March of 2006, Colleen experienced different treatment than her co-worker, Susan Ittleson, the other Quality Management employee located in the Camp Hill office.  Susan is younger than 40.

109. Colleen discussed some negative interactions she had experienced with Susan with Defendant Pooler.  Defendant Pooler stated that Susan processed things differently than Colleen did because she was younger than Colleen and that she simply did not understand.  Defendant Pooler told Colleen that Susan thinks like a therapist and that her responses to Colleen were probably her "wearing her therapist hat".

110. In April of 2006, Defendant Pooler asked Colleen to meet with her in her office.

111. She began to review with Colleen issues that she had identified several months earlier (during the February 14th episode).

112. She told Colleen that she wanted her to be sure of her position on these issues.  One issue was excessive absenteeism.

113. Colleen pointed out to Defendant Pooler that Colleen had a major operation and a serious wound infection and that when Colleen returned to work it was with the understanding that

Colleen would be required to take some time during the day to treat her wound.

114. Defendant Pooler did provide Colleen with the opportunity to take the time off when it was necessary, however, because Colleen had just returned from a Family and Medical Leave Act leave of absence and did not have accrued personal time off.

115. Defendant told that Colleen would have to take that time without pay.

116. This was a policy that Colleen had questioned many times, as there were numerous times when Colleen would work until as late as 9 p.m. and Colleen was never permitted to report these hours or receive any reimbursement for that time.

117. Colleen asked Defendant Pooler why it was that Colleen would be docked for time when there was no PTO but was not permitted to report hours worked beyond 40 hours.

118. Defendant Pooler stated it was UPMC policy and that she had checked with HR and this was what they informed her.

119. Defendant Pooler further stated that she was considering not permitting Colleen to take the full time she had approved for her wedding and my honeymoon.

120.   Colleen became very upset by this as she would have PTO accrued for that time and these plans were already made.

121.   Because of Defendant Pooler's threat to disallow Colleen the already approved time, Colleen worried constantly from April to July, when her wedding was scheduled, about what she would do if Defendant Pooler took this course of action.

122.   During this same meeting, Colleen asked Defendant Pooler if she was having a problem with her job performance and she said no.

123.   Colleen asked Defendant Pooler if Colleen had to change anything to make her happy and she said no.

124.   Colleen asked her if there was something she wanted to convey because Colleen did not understand why we were meeting.  Defendant Pooler said she just wanted Colleen to understand what her issues were and that she wanted consistency in her behavior.

125.   This was yet another reference to Defendant Pooler's perception that Colleen was mentally ill.

126.  When Colleen asked Defendant Pooler regarding this reference, she advised Colleen "you cycle between really good behavior and really negative behavior."

127.  On April 28, 2006, Colleen spoke with Jim Myers, Associate Regional Director of the Camp Hill Office to report issues with Defendant Pooler involving harassment, discrimination and intimidation.

128.  During this conversation, Colleen broke into tears and told Mr. Myers that she did not believe Colleen could endure this type of treatment for much longer.

129.  Mr. Myers appeared sympathetic and even offered to assume responsibility for management of Colleen, which she accepted as a positive resolution to the unbearable discrimination and harassment she was enduring under the supervision of Defendant Pooler.

130.  During that meeting, Mr. Myers said he would discuss this matter with Beth Pickering, Regional Director and would let Colleen know if his suggested resolution could be implemented.

131. In fact, shortly after this conversation with Mr. Meyers, there was a comment made by Defendant Pooler during a closed door "supervision" meetings with Colleen.

132. During that conversation, Defendant Pooler blatantly told Colleen she spoke with Jim and Beth and that Colleen could not make accusations of discrimination because she had no grounds on which to say she had been discriminated against.

133. Colleen asked her to explain this statement.  Defendant Pooler told her that she was not a minority and therefore could not be a victim of discrimination.

134. Colleen became very concerned that Tammy, Jim and Beth were discussing this issue and had already determined that based on her race that she had not been the victim of discrimination.

135. Several weeks later, Colleen was called into a meeting with Mr. Myers and Defendant Pooler.  She was told that Beth Pickering would not approve transfer of management and that Defendant Pooler would continue to manage her, but that if there were work related issues, that Defendant Pooler felt she could not handle, she would then seek guidance from Mr. Myers.

136.  On May 4, 2006, Colleen facilitated a 2nd Level Grievance as per her job duties.  The Community Care Peer Advisor assigned to the grievance, Lori Nelson-Lunberg requested that Colleen send her the packet of material to be considered for approval in advance of the meeting.

137.  Grievances also require a three party panel consistent with how Second Level Complaints are conducted.  Each member of the panel is to have had no prior decision making in the matter and should have equal opportunity to review the materials.

138.  Colleen responded to Dr. Nelson that she could not provide her with advance copies of the packet to be considered.

139.  Dr. Nelson advised Colleen that other counties (Allegheny and Chester) provided her with advance packets.

140.  Colleen was unaware that this had been occurring but still held firm that she would not be able to do what Dr. Nelson-Lunberg had requested as Colleen believed it contradicted with the rules and regulations set forth for conducting the Second Level Meetings.

141. At some point, Defendant Pooler became involved in this conversation and she spoke with Peter Klemens, the Complaint and Grievance Manager in Pittsburgh.

142. Defendant Pooler reported to Colleen that Pittsburgh was sending the packets to the panel in advance of the meeting and she directed Colleen to send the packet of information to all panel members in advance of the meeting so that each would have an opportunity to review the materials.

143. Colleen advised Defendant Pooler that she would not do this because the packet contained protected health information and that the consumer representative on the panel was not employed by Community Care or the County and was not bound by CCBH's confidentiality policy, in addition, Community Care would have no control over who was seeing the materials once they were received by the consumer representative.

144. Defendant Pooler then stated that they were to send the consumer representative a copy of Community Care's confidentiality statement and a stamped return envelope.

145. Colleen still refused to comply with her request again citing that she was concerned about a HIPPA violation.

146.  Colleen asked Defendant Pooler to discuss the situation with
      the compliance officer and seek guidance.

147.  Defendant Pooler became very agitated and advised Colleen
      that if she did not want to send the materials that she should
      ask the Administrative Assistant to do so.

148.  Colleen called her husband, Kevin Miles, from her desk and
      related the incident and expressed concern about HIPPA
      issues.  She advised her husband that she was considering
      reporting the request to Sr. Management, which she did.  The
      incident was later reported to James Meyers, Assistant
      Regional Director.

149.  Defendant Pooler approached Colleen at her desk shortly after
      her conversation with her husband and stated that she had
      "heard that Colleen wanted to file a HIPPA report" and that she
      did not need to do this as Defendant Pooler planned to review
      the issue with the County.

150.  Defendant Pooler later rescinded the direction to send
      member's protected health information because the County
      objected.

151. However, Defendant Pooler raised this issue during Colleen's November 2006 performance evaluation and cited her refusal as insubordination.

152. Colleen responded that she was refusing to break the law and that she believed under HIPPA regulations it was illegal for Defendant Pooler to ask Colleen to take this action.

153. Colleen believes that Defendant Pooler has resentment toward her for refusing to break the law and this has caused an exasperation of her negative treatment toward Colleen.

154. Colleen believed that had she not refused, Defendant Pooler would have allowed protected health information to be sent to consumer's homes and that would have resulted in a HIPPA violation.

155. Additionally, Colleen was being excluded from meetings and work functions such as Quality dinners.

156. Defendant Pooler was addressing Colleen as if she were mentally ill.

157. Defendant Pooler would tell Colleen repeatedly that she didn't know what it was about Colleen that people didn't like.  That for some reason people didn't like Colleen.  That Colleen had

difficulty communicating with people.  That Colleen had a difficulty communication style.

158.  At one point, Colleen asked Defendant Pooler to stop telling her that her co-workers did not like her as it was destructive and did not encourage team behavior.

159.  However, during Colleen's performance evaluation in November 2006, Defendant Pooler again told Colleen that her co-workers don't like her, are watching her, and are reporting about Colleen to her.

160.  On November 27, 2006 Defendant Pooler completed Colleen's annual employee evaluation.  During the evaluation, she provided a goals section in which the following goals were listed:

- Colleen would save two days (16 hours) of PTO before Defendant Pooler would approve requested time off and if Colleen used one of these days due to illness, she would replenish the time before being permitted to take PTO.

- Colleen would be aware of the use of personal telephone calls and their effect on workflow.

- Colleen would process problems with her or James Meyers as opposed to having emotional or reactionary responses.

161. During Colleen's November 2006 performance evaluation, Defendant Pooler accused her of over utilizing the telephone for personal use, and leaving early on days she was not here.

162. Colleen denied these allegations and requested that telephone records be examined to prove she was not making personal phone calls on work time.

163. Community Care has refused to pull records that would prove that Colleen did not abuse phone for personal use and refused to redact reference to phone usage from Colleen's evaluation.

164. Immediately following her November 2006 evaluation, Colleen spoke with Carole Taylor, Chief Clinical Officer of the company, and told her about her concerns.

165. She advised Colleen to address them with Ms. Pickering, Regional Director.  However, she also took this opportunity to tell Colleen that she was too detail oriented and she worried too much about the process and it appeared that Colleen was anxious.

166. Colleen put her concerns in writing and submitted them to Ms. Pickering.

167. Ms. Pickering and Colleen met on December 12, 2006.

168. Ms. Pickering insisted that there was some kernel of truth in the claims about Colleen's behaviors and that Colleen did not like Tammy.

169. Colleen disagreed and requested to have her complaint elevated.

170. Defendant Pooler has over the past year portrayed Colleen as mentally ill to members of management in CCBH.

171. Defendant Pooler has made comments that in their field would indicate a personality issue.

172. Defendant Pooler has treated Colleen with techniques that would be applied to someone with a personality issue.

173. Colleen had noted the loss of respect from members of Sr. Management.

174. This is a far cry from how Colleen was treated by these same people prior to Defendant Pooler becoming her manager.

175. Defendant Pooler's comments regarding emotional or reactionary responses in Colleen's November 2006 evaluation

shows that Defendant Pooler believed Colleen was mentally disabled and has treated her and portrayed her as such.

176. The results… what was once a place where Colleen could achieve and grow had become a constant source of stress and frustration.

177. Colleen does not believe that she will be treated fairly by management at Community Care as a result of many months of Defendant Pooler sabotaging Colleen's reputation based on a perceived disability, her age, her complaints about being docked for pay in violation of the Fair Labor Standards Act, and her refusal to violate the law.

178. As a result of this situation, Colleen had to seek treatment from her family physician for medication because she was unable to sleep at night.

179. Colleen repeatedly and formally asked CCBH and UPMC to investigate her complaints of discrimination and retaliation and take measures to make the situation better.  They failed to do so.

180. On November 29, 2006—after receiving the negative performance evaluation—Colleen spoke with Carole Taylor,

Chief Clinical Officer, to report issues with Defendant Pooler

involving harassment, discrimination and intimidation.

181.  Ms. Taylor informed Colleen that she had to exhaust all internal

processes before filing an external complaint with the EEOC or

PA Human Relations.

182.  Colleen was told to provide Beth Pickering a written rebuttal to

the comments in my evaluation and to make concrete

suggested remedies.

183.  She also informed Colleen that even though it might make her

angrier to hear it, she, Ms. Taylor, also perceived Colleen as

being "anxious" about details relative to Complaints and

Grievances and that she did not understand why she had been

trying to plan for every possible thing that could happen.  Ms.

Taylor told also said that it "drove her crazy" and that she no

longer wanted to discuss things in front of Colleen at meetings

due to this behavior.

184.  On December 11, 2006, Colleen sent an email to Beth

Pickering with a copy to Carole Taylor and Michael Anderson

inquiring if Ms. Pickering would agree to her requested actions

which were communicated during their prior meeting.

185.  Ms. Pickering did not agree to provide Colleen with all of the requested remedies that she had made.

186.  Furthermore, there was no acknowledgement of the continuous harassment and discrimination, retaliation and intimidation by Defendant Pooler.

187.  After providing Human Resources with a statement on December 11, 2006, Colleen was subject to additional retaliation for complaining including being ostracized at work, being told by the HR Vice President that she cannot use email to communicate, being falsely accused of harassing her supervisor, and being completely ignored and treated as if she were invisible by CCBH senior management, including Beth Pickering.

188.  After Colleen filed a complaint against Defendant Pooler and involved HR, it was discovered that Defendant Pooler, CCBH, and UPMC had been illegally docking Colleen's pay for partial days missed.

189.  At this time, Michael Anderson of UPMC Human Resources sent Colleen an email telling her that she was subject to

corrective action if she missed any additional partial days

without PTO available as UPMC would be required to pay me.

190. However, he did not mention the fact that UPMC was required

to pay Colleen overtime for extra hours worked.  Colleen

believes this was in retaliation for discovering Defendants'

violations of the law.

191. Mr. Anderson also stated that he could not discuss payroll

infractions with Colleen unless she signed a release, which he

called a confidentiality statement.

192. The statement said that Colleen would accept any pay they

gave her for the docked days and discuss the infraction with no

one.

193. On December 20, 2006, Mr. Anderson sent Colleen an email

which in part stated the following:

> I am comfortable sharing the compensation information
> with you without the signed confidential information form,
> as you have been provided written notice that this
> compensation information falls under the UPMC
> confidentiality policy and should not be shared with other
> employees.
>
> As you can see, there are many times when you have not
> had enough PTO time to cover your time out of the office,
> which is concerning since you are going to be paid for
> that time even though it was not worked due to your

exempt status.  You will be paid $988.31 in your 12/29 paycheck to rectify these payroll errors.

Regarding your statement, I want to be clear that the lack of payment for partial days was not a deliberate occurrence and is the result of our payroll system. You mentioned wanting to address this in your statement, which you are more than welcome to do.  However, I am looking for evidence of discrimination and/or hostile work environment as it relates to your claim against Tammy.  I am not sure that the payroll issue relates to this situation since Tammy is not in control of it.

194.  On December 20, 2006, Mr. Anderson sent Collen an email in which he stated in part that the payroll infraction was not Tammy's fault as she did not know the law and inquired if she had any orientation with UPMC.  Further he repeated that Colleen be subjected to corrective action for time without pay missed.

195.  Colleen believes that UPMC/CCBH was attempting to cover up its willful and negligent violations of federal law to avoid exposure to many other claims against their thousands of salaried employees.

196.  Colleen also believes that after complaining about the retaliation and hostility that she was being subjected to was met with a threat that she would be subjected to corrective action

and that in HR's opinion, it had already decided that

Defendant's Pooler was not at fault (so much for investigation),

and an intimidation in an attempt to have her sign a release

accepting their insufficient offer of the $988.

197. On December 21, 2006, Colleen sent her written complaint to

Human Resources regarding issues with Defendant Pooler

involving harassment, discrimination, retaliation, intimidation,

and payroll violations.

198. Colleen urged Human Resources to take her complaint

seriously, to provide a thorough investigation and that careful

consideration is given to all of the information gathered in the

course of the investigation.  However, it was not.

199. Defendants failed to take discrimination complaints seriously

and retaliated against employees for making complaints.

200. For instance, In January 2007, one of Colleen's co-workers had

complained of discrimination.  Right after she complained, she

was suspended and terminated.

201. Other co-workers had their jobs threatened if they participated

in an investigation by the employer's HR department.

202. After making an internal discrimination complaint, it was referred to as "making a mountain out of a mole hill" by both the Vice President of Human Resources and Beth Pickering, Regional Director in separate conversations.

203. Colleen asked a co-worker on Friday, January 5, 2007 to act as her witness to Defendant Pooler's treatment of her.  The co-worker told Colleen that their department manager informed them that they could not make any statements or become involved in the investigation.

204. This witness expressed reluctance to speak to Human Resources as she believed that there would be retaliation for her cooperation in any investigation of Colleen's discrimination complaint.

205. The co-worker's exact comment to Colleen was "you know how they are around here, if I talk to anyone, they will come after me".

206. As a result of the harassment, discrimination, and retaliation Colleen was forced to undergo at work, Colleen suffered health issues which include sleeplessness, stress, shortness of

breath, chest pain, high blood pressure and neck and back pain for which she underwent medical treatment in January 2007.

207.  Colleen found it increasingly difficult to work in close proximity to Defendant Pooler on a daily basis.

208.  Given the Defendants' inadequate response and failure to remedy the situation, on January 16, 2007, Colleen was forced to resign from her employment as it was unbearable.

## COUNT I:
## VIOLATIONS OF THE FAMILY AND MEDICAL LEAVE ACT

### *Against Defendants CCBH, UPMC, and Tammy Pooler Collectively and Individually*

209.  Plaintiff restates and realleges paragraphs 1 through 208 above as though fully set forth herein.

210.  29 U.S.C. §§2614(a)(1)(A) and (B) of the FMLA entitle employees who take FMLA leave, upon return from leave, to: (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

211. Defendants willfully violated 29 U.S.C. §§ 2614(a)(1)(A) of the FMLA because Defendants failed to restore Colleen to the position of employment she held when the leave commenced.

212. Defendants also violated 29 U.S.C. § 2614(a)(1)(B) of the FMLA because Defendants failed to restore Colleen to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

213. Previous to Colleen's 2005 FMLA request, Colleen had never experienced the pattern of antagonism as more fully outlined herein by CCBH and its supervisors.

214. Since Colleen requested and took FMLA leave in the Summer of 2005, CCBH and certain of its supervisory employees, including Defendant Pooler, interfered with Colleen's right to take up to 12 weeks of FMLA leave and also denied Colleen the equivalent terms and conditions of her employment.

## COUNT II:
## VIOLATIONS OF SECTIONS 2615(a)(2)
## OF THE FAMILY AND MEDICAL LEAVE ACT

### *Against Defendants CCBH, UPMC, and Tammy Pooler*
### *Collectively and Individually*

215. Plaintiff restates and realleges paragraphs 1 through 214 above as though fully stated herein.

216. 29 U.S.C §2615(a)(2) of the FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this title."

217. Defendants willfully violated 29 U.S.C. § 2615(a)(2) of the FMLA when it discharged and discriminated against Colleen because she opposed practices made unlawful under the FMLA.

## COUNT III:

## VIOLATIONS OF THE
## FAIR LABOR STANDARDS ACT, 29 U.S.C. §201 *et seq.*

### *Against Defendants CCBH, UPMC, and Tammy Pooler Collectively and Individually*

218. Plaintiff restates and realleges paragraphs 1 through 217 above as though fully stated herein.

219. Defendants willfully violated the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* when they withheld, or "docked" Colleen's earned income for nearly two years in spite of the fact that Colleen earned her income.

220.  Defendants willfully violated the FLSA by illegally docking

Colleen's salary for partial day absences over a period of two

years.

221.  Defendants further willfully violated the FLSA because they

failed to pay Colleen overtime for nearly two years after

Defendants' docked her pay.

## COUNT IV:

### RETALIATION IN VIOLATION OF THE
### FAIR LABOR STANDARDS ACT, 29  U.S.C. §201 *et seq.*

*Against Defendants CCBH, UPMC, and Tammy Pooler,*
*Collectively and Individually*

222.  Plaintiff restates and realleges paragraphs 1 through 221 above

as though fully set forth herein.

223.  Defendants retaliated against Colleen when they refused to

properly or promptly investigate her discrimination and

retaliation complaints and forced her to resign for her continued

attempt to legally and amicably collect his rightfully earned

money that was due him under the law but withheld by

Defendants' bad faith attempt to dock her pay for nearly two

years.

**COUNT V**

**VIOLATIONS OF THE HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT, 42 U.S.C. § 1320** *et seq.*

224.   Defendants violated the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320 *et seq.,* when they intimidated, threatened, coerced, discriminated against, and took retaliatory action against Colleen, a member of Defendants' workforce for refusing to disclose confidential patient medical information and otherwise participating in an investigation of a possible HIPAA violation.

225.   Defendants also violated HIPAA by intimidating and retaliating against Colleen because she refused to disclose confidential patient medical information and exposed a HIPAA violation by Defendant Pooler.

**COUNT VI:**
**VIOLATIONS OF PENNSYLVANIA WAGE PAYMENT AND COLLECTION LAW, 29 Pa. C.S.A. § 260** *et seq.*

*Against Defendants CCBH, UPMC, and Tammy Pooler,*
*Collectively and Individually*

226.   Plaintiff restates and realleges paragraphs 1 through 225 above as though fully stated herein.

227.   Defendants willfully violated the Pennsylvania Wage Payment
       and Collection Law, 29 Pa.C.S.A. § 260 *et seq.*, when they
       withheld Colleen's earned income for nearly two years.

228.   Defendants willfully violated the Pennsylvania Wage Payment
       and Collection Law by failing to pay Colleen's wages within 30
       days after the regularly scheduled payday.

229.   Said money was earned and owed to Colleen, and Defendants
       had no good reason to continue to withhold said monies,
       including liquidated damages, which were due and owing to her
       either wages or otherwise.

## COUNT VII

## VIOLATIONS OF THE PENNSYLVANIA PERSONNEL FILE ACT

230.   Plaintiff restates and realleges paragraphs 1 through 229 above
       as though fully stated herein.

231.   Defendants willfully violated the Pennsylvania Personnel File
       Act when they refused to allow Colleen and her agent to inspect
       her personnel file, despite repeated and reasonable requests
       while Colleen was employed with the Defendants.

232.   Therefore, Defendants' have violated the Pennsylvania
       Personnel File Act.

## COUNT VIII

## CONSTRUCTIVE DISCHARGE

233.  Paragraphs 1 through 232 are incorporated herein by reference as though set forth in full.

234.  Defendants have forced Colleen to resign from her employment because they created a hostile work environment during which she was subject to harassment, discrimination, and retaliation based on age and perceived disability, whistleblowing, request for FMLA leave, and they failed to take any corrective measures.

235.  As more fully outlined above, Defendants constructively discharged Colleen on or about January 16, 2007.

236.  Defendants knowingly permitted conditions of discrimination and retaliation so intolerable that a reasonable person subject to them would resign.

237.  Defendants and their employees engaged in unlawful discrimination and retaliation against Colleen.

238.  As a result, Colleen was forced to resign on January 16, 2007.

239.  Colleen was compelled to resign because of Defendants' unlawful discrimination and retaliation.

240.  A person similar to Colleen's protected class who was subject to the same conditions would have also resigned.

241.  Therefore, Defendants have constructively discharged Colleen in violation of the Family and Medical Leave Act, the Fair Labor Standards Act, the Pennsylvania Wage Payment and Collection Law, and the Health Insurance Portability and Accountability Act.

## COUNT IX

## RETALIATION

### Against Defendants CCBH, UPMC, and Tammy Pooler Collectively and Individually

242.  Paragraphs 1 through 241 are incorporated herein by reference as though set forth in full.

243.  Defendants have illegally retaliated against Colleen for complaining of discrimination and retaliation, by failing to investigate her complaint or to take any corrective action.

244.  Soon after complaining, Defendants and their employees had actual notice of Colleen's discrimination and retaliation complaint.

245. After complaining, Colleen suffered illegal retaliation by Defendants and their employees, more fully outlined above, which was materially adverse to a reasonable employee.

246. Additionally, the retaliation negatively affected the terms, conditions, and privileges of Colleen's employment with Defendants.

247. Defendants' actions against Colleen, as more fully outlined above, were harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.

248. Therefore, Defendants have retaliated against Colleen in violation of the Family and Medical Leave Act, the Fair Labor Standards Act, the Health Insurance Portability and Accountability Act, the Pennsylvania Personnel File Act, and the Pennsylvania Wage Payment and Collection Law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Colleen Miles, respectfully requests that this Court:

1. Assume jurisdiction of this case;

2.  Require Defendants to return Plaintiff to her position with the Defendants and to give to Plaintiff full wages and benefits commensurate to that position;

3.  Award to Plaintiff past and future damages for loss of income, growth opportunities, and all benefits denied to her due to the improper and unlawful actions of the Defendants;

4.  Award to Plaintiff incidental, liquidated, and punitive damages as allowed under the Family and Medical Leave Act, Fair Labor Standards Act, the Health Insurance Portability and Accountability Act, the Pennsylvania Personnel File Act, and Pennsylvania Wage Payment and Collection Law;

5.  Grant to Plaintiff costs, disbursements, and reasonable attorneys' fees;

6.  Fine Defendants for their violations of state and federal law; and,

7.  Award such additional relief in which this Court deems just and appropriate under the circumstances.


**JURY TRIAL DEMANDED**

RESPECTFULLY SUBMITTED,
BY AND THROUGH HER
ATTORNEYS,


_____*/s/*_____

Lisa Matukaitis, Esq.
PA BAR ID #:  202467
Aaron Gray Cohen, Esq.
PA BAR ID #: 200521
Aaron Gray Cohen Law Office
115 Pine Street
Suite 100
Harrisburg, PA  17101
 (717) 823-6460
agcohenlaw@verizon.net
lmcohenlaw@verizon.net

Dated:  February 26, 2007